**CURRIE et al. v. TRAMMELL. (No. 1931.)\***

(Court of Civil Appeals of Texas. El Paso. Dec. 9, 1926. Rehearing Denied. Jan. 6, 1927.)

**1. Novation ⬅️4—Simple contract for payment of money and hence negotiable instrument may be discharged by substitution of new obligation (Negotiable Instruments Act).**

Since a simple contract for payment of money may be discharged by substitution of new obligation, by terms of Negotiable Instrument Act (Vernon's Ann. Civ. St. 1925, arts 5932–5948), a negotiable instrument may be discharged by substitution of new obligation.

**2. Accord and satisfaction ⬅️16—Novation ⬅️1—"Novation" is agreement between all parties, with clear intention to discharge valid obligation by substituting new obligation, debtor, or creditor, while "accord and satisfaction" requires performance.**

"Novation" is an agreement between all parties concerned, with clear and definite intention to discharge valid existing obligation by substituting new valid obligation, new debtor, or new creditor, while in "accord and satisfaction" performance of new promise, not the new promise itself, is satisfaction.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Accord and Satisfaction; Novation.]

**3. Novation ⬅️1—Agreement that creditor would surrender debtor's notes on receipt of tally of cattle delivered to third party is "novation."**

Agreement that, on delivery of cattle to third party and receipt of tally by creditor, creditor would surrender debtor's notes and pay difference is a "novation."

**4. Bills and notes ⬅️527(2)—Finding that creditor agreed to accept note for debtor's note held sustained by evidence.**

Evidence *held* to sustain finding that creditor, acting through her agent, agreed to accept note of third party secured by mortgage on cattle in substitution of debtor's note, so that debtor's note and mortgage securing it were discharged.

**5. Novation ⬅️12—Evidence held to sustain finding that creditor's agent repudiated novation agreement.**

Finding that creditor's agent repudiated novation agreement *held* sustained by evidence, and hence creditor liable for its breach.

**6. Damages ⬅️191—Denying judgment for expenses for pasturage of cattle in cross-action for breach of novation agreement held not error, where expenses attributable to cattle could not be apportioned.**

In cross-action for breach of novation agreement involving transfer of cattle to creditor, failure to give judgment for expenses for pasturage, salt, and services *held* not error, where plaintiff in cross-action had other cattle, and expenses could not be apportioned, though generally person is entitled to recover all rea-sonable expenses in consequence of wrong suffered.

Appeal from District Court, Martin County; Chas. Gibbs, Judge.

Suit by Lucy Currie against D. M. Trammell. D. M. Trammell filed cross-action against plaintiff and others. The Midland National Bank was made party defendant. Judgment for defendant, D. M. Trammell, and Lucy Currie and others appeal. Affirmed.

See, also, 261 S. W. 827.

Morrison & Morrison, of Big Spring, for appellants.

E. R. Bryan, of Midland, for appellee.

WALTHAL, J. Lucy Currie, a nonresident, acting by her agent, W. B. Currie, brought this suit against D. M. Trammell, on two promissory notes, each note executed by Trammell and payable to Lucy Currie, one dated October 11, 1919, for $30,000, one year after date, bearing interest from date, and providing for the payment of attorney fees; the other note for $1,400, dated June 9, 1920, payable on demand, and bearing interest from date, and providing for the payment of attorney fees, and on which second note was a credit of $1,293.73, and to foreclose a mortgage lien on 500 head of cows and their increase given by Trammell to secure the payment of said notes. On affidavit of W. B. Currie, as agent of Lucy Currie, that he feared Trammell would injure and ill treat said property and remove same from the limits of Glasscock county, where the property then was, pending the suit; sequestration bond was given, a writ of sequestration issued and levied on said cattle sold under order of the court, and the proceeds turned into court. At the sale of the cattle under the court's order, W. B. Currie became the purchaser.

Trammell answered by general denial, admitted the execution by him of the two notes sued upon and the chattel mortgage sought to be foreclosed; alleges that each of said notes were fully paid before the filing of the suit, and the mortgage given to secure them was "satisfied and discharged by this defendant to the plaintiff through her agent, W. B. Currie, by novation." He further alleges that he borrowed from Lucy Currie, through her agent, W. B. Currie, the amounts of money for which the said two notes were given; that shortly before said notes matured Lucy Currie notified him that she would want the notes paid at maturity, and that to meet said obligations he entered into a verbal contract with Robert Currie, by the terms of which Robert Currie agreed to purchase from him 468 head of the cows and 11 bulls at the agreed price of $75 per head, provided Lucy Currie would furnish him (Robert Currie)

⬅️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

\*Writ of error refused February 23, 1927.

the money to pay for said cattle; that, in pursuance of said agreement, defendant and Robert Currie informed W. B. Currie of said agreement; that W. B. Currie, acting for Lucy Currie, agreed that, if defendant would include 2 registered bulls, withheld in the contract with Robert Currie, and would agree to give Robert Currie a bill of sale to his (defendant's) brand, in that event Lucy Currie would accept Robert Currie's or his notes and security in lieu of defendant's said two notes, and would pay to him (defendant) in money the difference between the said agreed price of said cattle and said two notes; that defendant agreed to include in the contract with Robert Currie the said 2 bulls and to give a bill of sale to his brand; that by the terms of said agreement said cattle were to be delivered by him and received by Robert Currie at defendant's ranch in Glasscock county, on or about November 15, 1920, at which time it was agreed between Lucy Currie, defendant, and Robert Currie, that, on the delivery of said cattle as above, Robert Currie would send Lucy Currie the number of cattle so delivered, and that Lucy Currie would surrender to defendant his said notes and pay him in cash the difference between the amounts due on said notes and the amount found to be due on the delivery of said cattle.

Defendant alleged that he was able, ready, and willing to deliver the cattle at the agreed time and place and accept the payment of the difference between the amount of said notes and the agreed price of the cattle, when the plaintiff, by causing the unlawful issuance and seizure of said cattle on the 15th of November, 1920, under said sequestration deprived him of the possession and control of said cattle; that, at the time and place when the delivery of said cattle was to have been made, defendant was there ready, able, and willing to deliver said cattle as agreed, and that he rounded up said cattle and counted them for the purpose of making said delivery; that there were 468 cows and 13 bulls which, under said agreement, amounted to $36,075, an amount in excess of that necessary to discharge defendant's said indebtedness to plaintiff; that plaintiff refused to carry out her part of said agreement, and refused to permit Robert Currie to carry out his part of said agreement; and that by reason thereof he is discharged from said obligations by novation.

Defendant filed a cross-action against Lucy Currie for damages based on the alleged failure on her part to carry out her part of the alleged agreement to accept Robert Currie in place of himself as her debtor on said notes, and to pay him the difference, as above.

Defendant alleges that he repeatedly tendered said cattle to Robert Currie, and that Robert Currie was willing to accept and receive said cattle, but that plaintiff refused to

carry out her contract to accept Robert Currie or his notes and security in lieu of defendant's notes, and to pay the difference between said indebtedness and the agreed price of said cattle. Defendant itemizes the several amounts as his damages sustained, substantially, as follows:

The difference between the alleged contract
  price of said cattle and the indebtedness
  on said notes on November 15, 1920....... $3,500 00
Pasturage of said cattle to April 15, 1921....  2 500 00
Salt during pasturage......................    100 00
Services of himself and one man during
  pasturage .................................  1,125 00

Defendant, in his cross-action, further reconvened for damages against plaintiff and her bondsmen by reason of the issuance, levy, and sale of said cattle, and says that said affidavit for said sequestration was false, in that plaintiff did not have any lien on or interest in the 326 yearlings levied upon and sold, by reason of her agreement, as alleged, to accept Robert Currie in lieu of defendant as her debtor; that said affidavit was false and without probable cause, in that defendant was not about to move said cattle from Glasscock county, and had not and would not ill treat or waste said property, and that said affidavit was without probable cause and maliciously made for the purpose of converting the 326 yearlings to plaintiff's use and benefit and depriving defendant of their value, and that by her said acts plaintiff has converted said yearlings to her own use and benefit. Defendant alleges the reasonable market value of said yearlings to be $35 per head, total value $11,-410; for all of said alleged damages defendant asked judgment against plaintiff and her sequestration bondsmen.

The Midland National Bank was made a party defendant as claiming to have some interest in the subject-matter of the suit, but was dismissed, and we will make no further mention of the bank.

The case was tried in Martin county on a change of venue from Howard county. The case was tried with a jury, and submitted upon the following special issues:

"(1) Did Mrs. Lucy Currie, acting through her agent, W. B. Currie, agree to accept a note signed by Bob Currie alone, secured by mortgage on the cows in question in substitution of D. M. Trammell's note?

"(2) If you have answered No. 1 affirmatively, did W. B. Currie repudiate said agreement?"

To each of the questions, the jury answered in the affirmative. The defendant moved the court for judgment in his favor, which was granted.

The judgment recites that the court finds that the notes sued on by Lucy Currie, with interest to November 15, 1920, amount to $33,429.36. The court also finds, that upon said date the 468 cows belonging to the defendant, Trammell, at the agreed price of $75 per head, amounted to $35,100; that the

difference between the notes and interest sued on and the amount due for said cattle was $1,770.64, making a balance due by Lucy Currie to Trammell, had said contract been carried out on November 15, 1920, of $1,-770.64, to which the court added 6 per cent. interest to November 4, 1925 (the date of the judgment), making the total principal and interest $2,298.64.

The court thereupon entered judgment in favor of Trammell and against Lucy Currie, on that portion of defendant's cross-action in the sum of $2,298.64, with interest thereon at the rate of 6 per cent. per annum, and all costs of suit, and canceled the notes sued on and the mortgage.

The judgment further recites the issuance of the writ of sequestration and the levy thereunder upon 436 yearlings belonging to Trammell, and sold under the order of the court, and that by virtue of which levy and sale "Lucy Currie converted to her own use and benefit the said yearlings which were of the reasonable value of $11,410, at the time of their conversion," to which amount the court added interest, aggregating $14,505.90, for which amount judgment was rendered in favor of Trammell and against Lucy Currie and her sequestration bondsmen, naming them. The judgment further recites the return into the registry of the court the proceeds from the sale of the cattle, and ordered its payment to Lucy Currie when the judgment was made final. The judgment further recited that Trammell take nothing on his cross-action for pasturage, salt, and labor in caring for said cattle as a part of his damages.

Lucy Currie excepted to the judgment and to the overruling of her motion for a new trial, gave notice, and has perfected her appeal.

### Opinion.

The questions presented here arise solely upon appellee's cross-action. He admitted the execution of the notes sued on and the giving of the mortgage on all of the cattle mentioned and the increase of the cattle, to secure the payment of the notes. Appellee's contention in his cross-action is that his two notes, upon which this suit is brought, were paid off and discharged by novation—that is, that Robert Currie primarily had agreed with him to purchase his 468 cows and 11 bulls at the agreed price of $75 per head, conditioned, however, that appellant Lucy Currie would furnish him the money to pay for the cattle; that later W. B. Currie, agent of Lucy Currie, when informed of the agreement as above between Robert Currie and appellee, W. B. Currie, acting for Lucy Currie, agreed that if appellee would throw in two registered bulls which appellee had withheld in his agreement with Robert Currie, and would give Robert Currie a bill of sale to his brand, then Lucy Currie would accept Robert Currie's notes and security in

lieu of defendant D. M. Trammell's notes, and would pay to the said D. M. Trammell the difference that said cattle would come to at $75 per head, and the amount of defendant's notes. Appellee alleges an acceptance on his part of the proposition of W. B. Currie. It is further alleged that the time and place for the delivery of said cattle were then agreed upon, and "it was further agreed between Lucy Currie, the defendant, and Robert Currie that, when said cattle were delivered, the said Robert Currie would send to Lucy Currie the number of cattle so delivered and that the said Lucy Currie would surrender to the said D. M. Trammell his said notes."

Does the above statement of the mutual promises of Trammell to sell a stated number of said cattle to Robert Currie at a stated price per head and to make delivery at a stated time and place, and a promise by Robert Currie to receive the cattle and pay for them as proposed by Trammell, and a promise by Lucy Currie that she would accept Robert Currie's notes and security in lieu of Trammell's notes and pay to Trammell the difference, if proved, constitute novation—that is, the execution and delivery of the two notes sued on, and the mortgage given to secure the payment of the notes, and the liability of Trammell thereon to Lucy Currie being admitted, do the mutual promises, as stated, show a mutual valid contract, substituting a new debtor, and new liability, that of Robert Currie, for the admitted obligations and liability on the notes of Trammell to Lucy Currie, the consideration for the new contract mutually being the discharge of the two notes?

[1, 2] Under our Negotiable Instrument Act (Vernon's Ann. Civ. St. 1925, arts. 5932–5948) a negotiable instrument may be discharged by any act which will discharge a simple contract for the payment of money. A simple contract for the payment of money may be discharged by the substitution of a new obligation for an existing one. Novation, briefly, is a mode of extinguishing one obligation by the substitution therefor of another; that is, the acceptance of a new promise or a new debtor in satisfaction of a previously existing claim. Novation is different from accord and satisfaction, in that in accord and satisfaction it is not the new promise itself but the performance of the new promise that is accepted as a satisfaction. 20 R. C. L. p. 361, § 2; Street v. Smith Bros. Grain Co. (Tex. Civ. App.) 255 S. W. 778; Hall v. Wichita State Bank & Trust Co. (Tex. Civ. App.) 254 S. W. 1036, and cases cited.

[3] Without undertaking to give a definition of novation that would satisfy every circumstance in which an effort is made to substitute a new obligation for an existing one, it might be said that a novation, as understood in modern law, is a mutual agreement,

between all parties concerned, for the discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the debtor to a creditor by the substitution of a new creditor. 20 R. C. L. p. 360, § 1. To effect a novation, there must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement. In the case at bar, it is alleged, as a part of the agreement, as between Trammell and Robert Currie, that, when the cattle were delivered to Robert Currie, and Lucy Currie had received the tally or number of the cattle delivered, she would surrender the Trammell notes and pay the difference. So that, if the agreement as alleged is supported by the evidence, there can be no doubt as to the intention or purpose of the agreement. We think the facts alleged are sufficient to show novation.

[4, 5] Are the mutual promises alleged sustained by the evidence? The evidence covers some 116 pages of the record. We have carefully reviewed it, but can state only brief portions of it. The jury found that Lucy Currie, acting through W. B. Currie, agreed to accept a note signed by Robert Currie alone, secured by mortgage on the cows in question, in substitution of the Trammell notes.

In the evidence, Robert Currie is referred to at times as "Bob" and "Bob Currie," W. B. Currie is referred to as "Bill" or "Bill Currie," and Lucy Currie is referred to as "Aunt Lucy."

As stated above, the outstanding and undischarged obligations of Trammell on the two notes, are admitted, in the answer, also the mortgage on certain of the cattle involved in the controversy to secure their payment.

The agency contract between Lucy Currie and Wm. B. Currie is in writing, we need not set it out. It expresses an appointment by Lucy Currie of Wm. B. Currie as her agent to make all loans, collect and handle moneys for her in Texas. It is also in evidence that Wm. B. Currie had the notes in his possession and acted for Lucy Currie as agent in her effort to collect them, and, out of the mass of evidence heard on the trial we can state only portions of it, and of such portions such as tend to support the jury's findings on the two issues submitted. D. M. Trammell testified:

"I have had business transactions between Robert Currie and Lucy Currie through her agent, Wm. B. Currie. I sold them a bunch of Hereford cows. The trade was this: I had my cattle in Glasscock county, and I had been called on to pay my notes, and I decided to sell them. * * * I sold a bunch of cows to Robert Currie. I sold him everything in the O brand. * * * There were 468 head of cattle the day Bob Currie was to receive them. I agreed to sell him. I agreed to sell him 11 bulls at the same price of $75 per head. In this it became necessary for me and Bob to consult with Wm. B. Currie. When I sold Bob the cattle he said he would go down to Big Spring and see Bill; that Aunt Lucy said that two could buy a bunch of cattle better than one, and Bill was her agent and she wanted him to pass on the cattle, and we got in my car and went to Big Spring and went to the First National Bank. * * * Bob asked where Bill was, and Temp (Currie) told him he was in the back of the bank. We went back there, and I stood in the door and Bob told Bill he had bought the cattle, and Bill asked him how much he was to pay for them and Bob told him $75; that he was to take all the cows and unbranded calves and 11 bulls. Bill said, 'What about those other bulls?' I said, 'I want to keep out 2 bulls and I will reserve them' Bill said, 'Bob, are you buying these cattle to keep?' and said, 'If you are, you can pay for them, they are worth the money, but if you are going to trade on them I won't fool with them.' Bob said, 'I want to stock the ranch with them and keep them.' Bill said, 'That is all right.' Then Bill said, 'Trammell, we want a bill of sale to your brand.' I hesitated; I didn't want to give him the brand; I had run the brand a long time and I did not want to give a bill of sale for it, but I finally agreed to let him have it, agreeing to give him the brand. * * * Bill said, 'Bob, count the cattle, divide and tally and give Trammell a note stating how many cattle there are;' but he says, 'Now listen, don't you leave those cattle if it takes two months to wean those cows away from the calves, they will be hard to keep over there; if it takes two months don't you leave it to a hired man or boy. You attend to it yourself, Aunt Lucy isn't in no hurry about fixing up the papers.' Bob said, 'Trammell wants $100;' and Bill said, 'Have you got any money?' Bob said, 'Yes; I have got some money in Midland.' Bill said, 'All right.' We left. Bob was going to Garden City, and I was going to the ranch. We went through Garden City. I left Bob at Henry Currie's; next morning I looked over the pasture a little and came on up to Garden City to Henry Currie's place and picked Bob up. On our way home Bob told me that 'they had called him up and called the trade off.' I said, 'Who?' He said, 'Temp wouldn't let me take the cattle.' * * * I called Bill Currie over the phone and asked him, 'What was the matter?' He said, 'There was a misunderstanding.' I said, 'Not between us.' He said, 'No; between him and Bob.' I said, 'You have bought some cattle; I have closed the trade with you.' He said, 'You can't make me do anything.' * * * I asked him (Bill) why he didn't take these cattle. He said Temp and him talked it over after we left the bank and tried to catch me before I left town. * * * I said, 'What has Temp got to do with it?' He said, 'Temp done what he told him to do.' * * *

"My purpose in selling those cattle was to pay that note. I did not transact any of this business with Mrs. Lucy Currie. I never saw her that I know of in my life, and never met her. Bill Currie loaned me the money, and I transacted business with Bill Currie, who was acting for Lucy Currie. Bill Currie said it was Lucy Currie's money, that she was the one that the mortgage and notes were made to. He was loaning me this money for her. When Bob Currie and

I went down to Big Spring to see Bill Currie. Bill told Bob to bring him a tally and he would settle with me; if there was anything coming to me he would give it to me, and for him to stay with those cattle until they were weaned, that Aunt Lucy would be in no hurry about fixing up the papers. * * * After I returned from Oklahoma, I sent my son, W. E. Trammell, to Bill Currie in regard to receiving those cattle. I received a statement from my son, and upon receiving that statement I went down and notified Bob Currie that we would go and get the cattle on the date they were to receive them. When we got down there Bob's son had left there coming to town. There were two roads, and we went one road and he went another, and Bob told me and told Frank Hill who was with me to tell his son to get some groceries and hire a man and bring them back down there, and he could send his horses and wagon across the country and Bob would come to town. He had hired Frank Hill to help him, and he and Frank were to come down in the car to the ranch and receive the cattle. Bob was tickled to death to receive the cattle; he was the happiest man I nearly ever saw. * * * I was getting up my brand and was scouring the country, and got on a horse and worked outside pastures to see if there were any cattle on the outside. Bob did not come down. He told me why. He said they wrote him a note and told him not to receive the cattle. * * * I went on down there and rounded up the cattle on the 15th of November. I counted them and there was 468 head of cows and 13 bulls. The 13 bulls included the two registered bulls which I had originally reserved. I was ready, willing, and able to deliver these cows to Bob Currie if he had come to receive them. * * * I did not sell or agree to sell to Bob the branded calves out of those cows; they were not included in it, just the cows and unbranded calves, which was somewhere between 35 and 50 head. I had not branded the short aged calves. At that time there was somewhere in the neighborhood of 340 of those branded calves; I guess I used 14 of them. * * * I counted the cows. The man was to be there the next day that I had sold them to, and I counted the cows and one of my neighbors counted the calves. * * * As well as I remember the branded calves tallied out 340. * * * I did not send or take a tally of those cows to Wm. B. Currie because I didn't get a tally from Bob. I was ready to turn the cattle over to Bob and take a tally to Wm. B. Currie if Bob had received them; I was there for that business. * * * Robert Currie did not tell me at any time prior to November 15, 1920, that he did not want those cattle; he always said he wanted the cattle and always expressed a willingness to me to receive the cattle. * * * As to whether Bill ever went and looked at the cattle, Bill says, 'I know what the cattle are, they are worth the money.' He told Bob, 'If you are going to keep those cattle, I will pay for them;' and the last trade that was made I made it with Bill Currie, because he exacted that I look after the cattle the first day and first night, and put those two bulls extra and that I should give him a bill of sale to the brand; that is, give Bob Currie a bill of sale to the brand. I did not give Bob a bill of sale, that I would have been glad to.

* * * He (Bill) did not turn over the note to me. The condition under which he was to turn over that note to me was, when I counted the cattle and Bob counted the cattle and wrote him a tally and sent it by me to Big Spring, Bill was then going to settle up with me and if there was anything coming to me he would pay me the difference. Bill Currie did not tell me that Lucy Currie had authorized him to do that. All that was ever said in my presence about notes was that Bill told Bob not to be in no hurry to wean those cows from the calves, that Aunt Lucy wouldn't be in no hurry to fix up the papers. I had been told by Henry (Currie) and Bob both that Aunt Lucy had $50,000 laying in the bank for Bob's benefit at 6 per cent. interest for five years. Bob told me that before we went down there to look at the cattle."

Wm. B. Currie testified:

"I am the W. B. Currie that represented Lucy Currie in effecting this loan to the defendant, D. M. Trammell (referring to the loan represented by the notes). * * * Henry Currie approached me the first time about a sale of these cattle to Robert Currie. * * * Mr. Trammell and Bob Currie came down to Big Spring. * * * Mr. Bob Currie told me he bought the Trammell cattle, and Mr. Trammell wanted to know how about it, and I said, 'It is all right; if Mr. Bob Currie goes down there and receives the cattle and you bring me back a tally signed by Bob Currie, I will pay for the cattle.' * * * Mr. Trammell was to bring the tally to me; Bob was to receive the cattle and send me the tally and I was to settle with Mr. Trammell. * * * I understood he paid $75 for the cattle with the bulls included, and I suggested that he put in 2 bulls that he was holding out. They went down and never did bring me a tally. * * * I told Mr. Trammell and Bob Currie if Bob had bought the cattle and went down and received the cattle and came back with a tally I would pay for the cattle and take up Trammell's notes, and, if the cattle brought more money I would pay Mr. Trammell the difference, if there was any. I did not state what the security was to be. * * * The $30,000 note that I am suing on was Lucy Currie's money. * * * I think that $1,400 was Mrs. Lucy Currie's money."

Robert Currie testified:

"If I had bought the Trammell cattle, Mrs. Lucy Currie was to furnish the money with which to pay for them, if Henry or Bill had passed on them. Bill Currie and Temp Currie loaned money for Mrs. Lucy Currie at times. * * * I was getting the money through Henry Currie, and it was Lucy Currie's money that I was going to get. * * * Bill said he ought to have 10 per cent., but, if Henry had arrangements with me to get it for 6, it would be all right."

In answering the following questions in a deposition the witness said:

"Question: Is it not a fact that you told E. R. Ryan in summer or fall of 1921 that, after you had purchased said cattle and agreed to receive them on or about November 15, 1920, Wm. B. Currie or some one for him sent you

word not to receive said cattle as he would not pay for them? Answer 'Yes' or 'No.' "

The witness replied:

"I answered that deposition 'Yes' and that is true, yes, sir."

The court was not in error in excluding the offered evidence of the witness Wasson. The parties to the agreement were the only ones who could breach it. The evidence offered was in contradiction of Trammell on an immaterial matter. We think the evidence is sufficient to sustain the first finding of the jury to the effect that Lucy Currie, acting through her agent, Wm. B. Currie, agreed to accept Robert Currie and his security in substitution of D. M. Trammell, and in discharge of the Trammell notes.

There is no controversy in the evidence as to the mutual agreement between Robert Currie, D. M. Trammell, and Wm. B. Currie, representing Lucy Currie, in the matter of the sale and purchase of the cattle, and the discharge of the notes on the delivery of the cattle and the number ascertained.

The evidence quoted and evidence not quoted show beyond controversy that Trammell and Robert Currie at all times were willing and even anxious to carry out the agreement.

Appellee, in his cross-action, alleged that Lucy Currie, acting through Wm. B. Currie, refused to carry out her part of the contract. The jury found that Wm. B. Currie repudiated the ' agreement. The evidence quoted is sufficient, we think, to sustain the finding.

The effect of the novation, where it is absolute and unconditional, as here, is to release the original debtor or discharge the original contract. 20 R. C. L. p. 373, par. 18, and cases cited. Here it operates to discharge the original two notes and the mortgage on the cattle given to secure them. The mutual agreement of the parties furnishes the consideration as between the original debtor and his creditor, the discharge of the original debt is a sufficient consideration. 20 R. C. L. p. 367, par. 10, and cases cited; Street v. Smith Bros. Grain Co. (Tex. Civ. App.) 255 S. W. 778. Here it is made quite clear, as between Trammell and Wm. B. Currie, that the purpose of all of the parties in the sale of the cattle to Robert Currie was to discharge the two notes and the mortgage on the cattle not included in the mortgage, where it is agreed, in effect, that credit will be given on the notes to their full amount, and the difference, if any, paid in cash, at $75 per head of the cattle on delivery as shown by the tally when returned. Here, as found by the jury, the accord, as expressed in the agreement, was defeated by Wm. B. Currie, and the delivery of the cattle was not made but delivery defeated by notice before time of delivery to Robert Currie and Trammell that payment as above would not be made. If we are not in error in holding that novation was effected, it follows that appellant's cause of action on the notes and foreclosure of the mortgage was lost.

Appellant sued on the notes and sequestrated the cattle covered by the mortgage. The cattle were sold under order of the court and the proceeds placed in the registry of the court pending the suit.

[6] The only question remaining that we need to discuss is the claim of appellee that he was entitled as matter of law, under his pleading and the evidence, to a judgment as a part of his damages, the expenses incurred by him for pasturage, salt, and personal service of himself and one man, in caring for the cattle from the 15th day of November, 1920, when they were to have been delivered until the cattle were taken under the sequestration. The pleading and the evidence are sufficient to have justified the judgment for the several items claimed. Appellee submits, as fundamental error, the failure of the court to render judgment for appellee for the several items of expense. While, as a general rule, a person is entitled to recover as damages all reasonable expenses to which he may have been put in consequence of the wrong or injury inflicted (C. J. vol. 17, p. 798, § 124j), in this instance Trammell had cattle of his own not involved in the novation agreement, for which the pasturage, salt, and services were furnished, but we are not able, in the condition of the record, to separate the two and know the expenses attributable to each.

We have considered all of the propositions, and while not discussing them severally we think the matters discussed embrace them.

Finding no reversible error, the case is affirmed.